UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

ALLSTATE INSURANCE CO.,                    CIVIL ACTION
ALLSTATE INDEMNITY CO., ALLSTATE
PROPERTY & CASUALTY CO., ALLSTATE
FIRE AND CASUALTY INSURANCE CO., AND
ALLSTATE COUNTY MUTUAL INSURANCE CO.

VERSUS                                     NO. 08-810

COMMUNITY HEALTH CENTER, INC.,             SECTION "C" (5)
COMMUNITY HEALTH & REHABILITATION
CENTER, INC., KATHY HAMPTON, LEON
HAMPTON, AND MID CITY IMAGING


**OPINION**

**I. INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**II. BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
    **A. Kathy Hampton and Hampton Healthcare** . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
    **B. Community Health Center** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
    **C. Allstate's Claims Processing** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

**III. CONTENTIONS OF THE PARTIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

**IV. ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
    **A. Claim 1: Fraud/Misrepresentation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
        **1. Affirmative Defense: Prescription** . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
        **2. Standards for Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**
        **3. Analysis of Specific Fraud Allegations** . . . . . . . . . . . . . . . . . . . . . . **24**
            **a. Unsigned Doctor's Reports** . . . . . . . . . . . . . . . . . . . . . . . . . . **24**
            **b. Technician Conducted Initial Evaluations** . . . . . . . . . . . . . . **29**
            **c. Stamped Prescriptions, MRI Orders, and Returns to Work** . . . . . **32**
            **d. Unbillable Treatments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **39**
            **e. Forged and Photocopied Modality Forms** . . . . . . . . . . . . . . . . **45**
            **f. Upcoding and Billing at Improper Intervals** . . . . . . . . . . . . . . **46**
            **g. "Certified Health Care Facility"** . . . . . . . . . . . . . . . . . . . . . **47**
            **h. "Physical Medicine" & "Rehabilitation"** . . . . . . . . . . . . . . . . **48**
            **i. Misrepresentation by Silence or Omission** . . . . . . . . . . . . . . . **49**
        **4. Causation of Injury** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **52**
    **B. Claim 2: Unjust Enrichment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **55**
    **C. Counterclaim 1: Defamation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **56**
    **E. Counterclaim 2: Tortious Interference** . . . . . . . . . . . . . . . . . . . . . . . . . . . **57**

**V. CONCLUSION & ORDER** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **58**

## I. INTRODUCTION

The Court conducted a bench trial from Monday, September 30, 2013 to Friday, October 4, 2013 on the Louisiana fraud and unjust enrichment claims by plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate County Mutual Insurance Company (hereinafter "plaintiffs," "Allstate," or "the Company") against defendants Community Health Center, Inc., Community Health & Rehabilitation Center, Inc., Kathy Hampton, Leon Hampton, and Mid City Imaging. The Court heard defendants' counterclaims for defamation and tortious interference with business against Allstate during the same bench trial. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

After careful consideration of the live testimony and voluminous evidence in this matter, the Court rejects the claims of both parties. The vast majority of fraud allegations that are even arguably supported by the evidence are subject to prescription. For those few claims that have not prescribed, Allstate has failed to show that it relied to its detriment on matters misrepresented. Allstate's claim for unjust enrichment is barred by the availability of a tort claim for fraud or negligent misrepresentation. Finally, defendants fail to prove that Allstate either defamed them or tortiously interfered with their business.

## II. BACKGROUND[1]

_____

[1]To the extent that any finding of fact in this Opinion constitutes a conclusion of law, the Court adopts it as such. To the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

2

Plaintiffs are Illinois-based liability insurance companies. At all times relevant to this matter, plaintiffs insured motorists in the East Baton Rouge area. Community Health Center, Inc. and its successor entity, Community Health and Rehabilitation Center, Inc. (collectively "Community") are corporations that did business in East Baton Rouge Parish, Louisiana since 2001. Together with Mid City Imaging, Community issued medical records and bills in connection with 188 personal injury claims made against individuals insured by the plaintiffs. This case concerns the alleged fraudulent nature of those records and bills.

## A. Kathy Hampton and Hampton Healthcare

Defendant Kathy Hampton was sole owner and director of the now dissolved Community. Ex. K; Tr. vol. 2, 167. Before opening Community, Ms. Hampton worked at a railroad company as a clerk and, by her own account, a very successful telemarketer. Tr. vol. 4, 187.

After leaving the railroad in 1999, Ms. Hampton opened Hampton Healthcare as its sole owner. Tr. vol. 1, 8; Tr. vol. 4, 222. Ms. Hampton collaborated with her husband and a man named Michael Prince on the venture. Tr. vol. 1, 8-9; Tr. vol. 2, 139. Ms. Hampton was not aware at the time that Prince, whom she believed was a doctor, did not have a license to practice medicine. *Id.* at 140. Ms. Hampton acted as owner of the business because her husband had a felony conviction. *Id.* at 141. Ms. Hampton's husband became an officer of Hampton Healthcare. *Id.* at 142-43.

Prince had operated some 19 clinics in the Houston area before working on Hampton Healthcare. Tr. vol. 2, 140. When Hampton opened, Prince supplied the forms used, including waivers and consent forms and treatment documentation. The doctors at Hampton Healthcare

were Dr. Hines, whom Prince's father had identified, and a neurosurgeon, Dr. Warren Williams, whom Dr. Hines knew. Tr. vol. 1, 64.

Prince conducted Hampton's billing through a separate company, Footprints. Tr. vol. 2, 142. In exchange for providing this service, Prince or his company received 5% of Hampton Healthcare's gross receipts and 60% of its revenue. *Id.* Ms. Hampton described her chief responsibility as making sure the doctors were where they were supposed to be. Tr. vol. 4, 182. Hampton's husband, in exchange for whatever he earned, provided consulting services and operational support. *Id.* at 141.

Hampton Healthcare's patients were almost exclusively Medicare Recipients. *Id.* at 143. There were a small number of personal injury patients, whom Dr. Hines treated in his own office. *Id.* at 143, 158. Before opening Hampton Healthcare, Ms. Hampton trained with Prince's mother on Medicare rules and restrictions. Initially, Hampton's doctors and technicians treated patients at an office of some kind. Tr. vol. 4, 182. However, after the business left that space, Hampton's technicians provided in-home treatment. *Id.* Hampton relied exclusively on passive modalities of treatment - electrical stimulation, ultrasound, hot and cold packs, and massage - and utilized employees who lacked formal physical therapy certification to provide this treatment, including Bridgette Azaone (then Coleman), who had previously worked for Dr. Williams. Tr. vol. 2, 166; Tr. vol. 4, 191. Hampton billed Medicare using current procedural terminology ("CPT") codes. Tr. vol. 2, 146.

At some point, Medicare began investigating Hampton. In or about August of 2000 or 2001, they advised someone associated with clinic that it could not bill for in-home treatment without physician supervision. Tr. vol. 2, 148, 150. According to Ms. Hampton's testimony,

which was the only evidence provided on this point, Medicare relayed this information directly to Footprints. *Id.* at 145. Footprints informed Ms. Hampton only that there was a problem with the billing. *Id.* at 149. Medicare also advised that Hampton had to support billing with documentation of the minutes that a particular modality was applied to a patient, not just the areas to which the modality was applied. *Id.* at 147.

After Medicare's intervention, Hampton Healthcare continued to treat patients and bill as they had been billing for approximately two weeks. *Id.* at 149. Ms. Hampton made efforts to contact Medicare; eventually, a representative came to speak with both her and Dr. Williams. *Id.* at 150. Perhaps, as part of this consultation, Medicare requested and received three or four patient files from Hampton Healthcare. Tr. vol. 1, 65. During said meeting(s), Ms. Hampton was given to understand that the representative would be sending proper billing sheets for them to use. Tr. vol. 2, 149, 151. This did not take place. Instead, Medicare stopped honoring billing under Ms. Hampton's Medicare number. *Id.* This prompted Ms. Hampton to work out of Dr. William's private practice. *Id.* at 152.

Ms. Hampton and Dr. Williams hired two physical therapy assistants to see Medicare patients. *Id.* at 155-156, 158; Tr. vol. 4, 185. Ms. Hampton also hired Bridgette Azaone, former employee of both Hampton Healthcare and Dr. Williams's private practice, to perform treatments on personal injury victims seen by Dr. Williams. Tr. vol. 2, 158. It was the intention of both Dr. Williams and Ms. Hampton to bill for physical therapy under Dr. Williams's Medicare number. *Id.* at 157. This plan ran into difficulties because the therapists, although compensated by Dr. Williams, were not properly linked to his practice. *Id.* at 157, 158. After further consultation with a Medicare representative, the two gave up the Medicare practice. *Id.* It

was at this time that Ms. Hampton formed Community.

At some point, the FBI opened its own investigation into Michael Prince, Hampton Healthcare, or both, during which they seized Hampton Healthcare records from an attic in Dr. Williams's Dijon Road office. Tr. vol. 2, 152. The United States prosecuted Michael Prince for Medicare fraud. *Id.* at 153. Ms. Hampton retained the services of a criminal defense attorney who brokered an arrangement that allowed her to avoid more serious consequences. *Id.* Under this arrangement, Ms. Hampton personally paid a fine of $40,000 - the amount which she had drawn from Hampton Healthcare after it was advised by Medicare of its improper treatment and billing practices. Tr. vol. 4, 185-86. Medicare officially revoked Ms. Hampton's Medicare number. Tr. vol. 2, 155. Ms. Hampton agreed to testify at Prince's criminal trial. *Id.* She turned over her personal financial records and tax documents from 2007 to the FBI. *Id.* at 153. She further refiled her 2007 taxes because she had under-reported income. *Id.* Ms. Hampton's uncontested testimony places the start of this process in the 2004-2005 time frame. *Id.* at 160.

## B. Community Health Center

After her unsuccessful attempt to revive a Medicare-based practice with Dr. Williams, in late 2001, Kathy Hampton decided to open a soft-tissue, personal injury clinic with him instead, which became Community. Tr. vol. 1, 70. Community relied largely on Hampton Healthcare's model. The patient intake and treatment forms were exactly the same, including apparently the modification to allow modality times to be recorded. Tr. vol. 1, 16. Community, like Hampton, exclusively administered passive modalities to its patients, using technicians without physical therapy certification. *See generally* Ex. A. These technicians were generally trained in the use of the equipment by other technicians. Tr. vol. 1, 157.

Initially, Community operated from within Dr. Williams's office on Dijon Road. Early on, the number of patients was small - 15 or so new patients per month. Tr. vol. 1, 74. As time went on, and the patient list grew, Community relocated from Dr. Williams's office to its most recent location on North Foster Drive, with some stops in between. *Id.* at 72. Eventually, Community list of active patients grew to a number sufficient to overburden available treatment spaces. *Id.* at 160.

While the practice was located in Dr. Williams' office, he was responsible for all care provided. Tr. vol. 1, 70. The parties disagree about whether he remained the medical director for either official or practical purposes when it relocated to North Foster. *Id.* at 65, 70, 138. Dr. Williams left Community in 2006. *Id.* at 78. Community employed Dr. Nedra C. Jackson between 2002-2007. *Id.* at 112. However, during this time, Community was primarily serviced by Dr. Jackson's nurses instead of Dr. Jackson herself. Community retained the services of Dr. Latrecia Bell (formerly Broussard), a licensed chiropractor, from 2006 to 2008. Tr. vol. 3, 5, 9. It employed Dr. Paul Matthews as a chiropractor beginning in 2008. *Id.* at 30.

This case primarily concerns evaluations and treatments rendered during the tenure of Dr. Williams and Dr. Jackson. During that time, the general plan for Community was to obtain new patient referrals from personal injury attorneys. Tr. vol. 1, 17; Tr. vol. 2, 170. When these new patients would come seeking treatment, an employee would have them fill out paperwork which asked them to describe their pain and their recent traumatic event. Tr. vol. 1, 161. Once the patient paperwork was completed, a technician would create a patient chart with relevant information. *Id.* at 85-86; Tr. vol. 3, 154. A physician would evaluate each patient, make a diagnosis, and prescribe therapy, recording all of this information by hand on the patient chart.

Tr. vol. 1, 34; *see, e.g.*, Ex. B, BSN 08372-73 (Community patient chart filled out by hand). For certain patients the physician would prescribe medication or order outside imaging. Tr. vol. 1, 146-47. Almost invariably, the physician recommended some combination of the passive modalities that Community was equipped to provide. *See generally* Exs. A & B. The recommendation was supposed to detail where on the patients body each modality was to be applied and the number of days per week that the patient could receive therapy. Tr. vol. 1, 147. Variables like precise time and intensity of the modality were calibrated by technicians according to patient comfort levels. Tr. vol. 4, 50. A patient would treat in this manner until he or she was discharged at a physician conducted follow-up evaluation or stopped coming for a different reason. The technician would document the time and location of each treatment on paper as it was administered and sign off on each session afterward.

There was evidence that Community's practice at times fell short of even these modest standards. Kari Lee, a technician of 6 months, testified that it was common place to administer modalities to patients before they were seen by a physician or had a recommendation for therapy, according to where the patient said he was in pain. Tr. vol. 1, 159, 160. Even where there was a therapy recommendation from a physician, technicians sometimes departed from it by treating the patient where he or she claimed to be hurting that day. Ms. Lee was instructed by another technician, Kenneth Jackson, to sign off on ultrasound treatments for every patient she treated, despite the fact that she never personally performed an ultrasound. Tr. vol. 1, 168. Finally, at a certain point, it appears that Community began seeing a significant number of patients who were not represented by any attorney with respect to their claimed personal injury.

Ms. Hampton was in charge of marketing for Community. Tr. vol. 4, 188, 203. She also

made final employment decisions. Tr. vol. 3, 59-60. Her day-to-day operational control was limited by the fact that she only came to the office two times a week. Tr. vol. 1, 159; Tr. vol. 3, 77. As owner, Kathy Hampton was in charge of billing, although she employed several others, including Della Maguire, and her son, Leon Hampton, to either help with or discharge fully this responsibility. Tr. vol. 1, 17; Tr. vol. 2, 167; Tr. vol. 4, 209, 234.

Community did not expect patients to pay for treatment directly or through public or private health insurance; rather these personal injury referrals were treated under an expectation that payment would be made out of any judgment or settlement received. Tr. vol. 2, 172. Community asked patients to identify the party responsible for their accident and his or her liability insurer and to provide copy of the police report when they first came into the office. Ex. A, BSN 00299. It was common for patients not to see any bill for treatment. Tr. vol. 2, 172. If new patients were unrepresented by counsel, Community had them sign liens of privilege purporting to guarantee Community's right under state law to collect payment for treatment out of any judgment or settlement reached in their accident case. Tr. vol. 2, 236. For represented patients, Community sometimes accepted the attorney's promise to pay in lieu of a lien. *Id.*; Tr. vol. 3, 78-79.

To facilitate collection, Community furnished billing and records to the attorney representing the patient or, in the case of an unrepresented patient, directly to the liability insurer representing the person responsible for the accident. Tr. vol. 1, 181. It was understood that the attorney receiving records would provide them to the liability insurer in some sort of demand packet. *Id.* When determining what to include in a demand packet for an attorney, Community took into account the attorney's preference. *Id.* at 81. However, it appears that Community

would provide at minimum an itemized bill for services rendered, a typewritten evaluation, and a typewritten narrative. *See, e.g.*, Ex. A, BSN 00441-46.

When an insurer would issue a subpoena, Community would respond with additional records, including handwritten treatment notes, copies of prescriptions, and notes authorizing returns to work. Tr. vol. 2, 174. However, Ms. Hampton testified that Community did not provide Allstate with copies of patient sign in sheets or other items from the patient file, until she was contacted by an attorney representing Allstate and directed expressly to do so. *Id.* Certain of the files produced to Allstate contain a certifications of their completeness. *See, e.g.*, Ex. A, BSN 00156.

When attempting to collect on an unrepresented patient, Community would send Allstate a notice of its lien of privilege. Tr. vol. 2, 236; *see also, e.g.*, Ex. A, BSN 00267. This notice advised that Allstate could be liable separately to Community for the cost of treatment if it erroneously forwarded the amount owed to the patient in the first instance. *Id.*

## C. Allstate's Claims Processing

Allstate adjustors review and investigate personal injury claims made against their insureds in three steps. At the first step, they determine whether the insured is covered for under a valid policy for the claimed injury. *See, e.g.*, Tr. vol. 4, 6, 48. At the second, they determine whether the insured is liable for the claimed injury. *Id.* At the third, they determine the "value" of the claim. *Id.* The value is the amount that the adjustor recommends offering or authorizing in settlement. *Id.* The adjustor determines this amount using records obtained from the medical provider for the injured party, if that person has sought medical treatment. *Id.* at 7.

When adjustors reviewed medical records and bills to determine the value of the case,

they were generally concerned with three issues: (1) whether the records support the injury claimed, (2) the size of the bill, and (3) the length of the treatment. *Id.* at 6-7. Apart from these issues, factors such as jurisdiction and the insured's policy limit factor into an adjustor's recommendation on a case. *Id.* at 18. Allstate uses a computerized claims evaluation tool called Colossus to help value claims. Colossus factors in the type of injuries involved, demographic information about the patient, type of complaints noted on medical reports, the duration of treatment, the amount of the medical bills, and the jurisdiction where the accident took place to determine a value of the claim. *Id.* at 21, 127. However, Colossus is consider a mere tool to the adjustor; an adjustor's ultimate rationale for a certain recommendation are contained in his or her file notes. *Id.* at 21, 27-28.

If the adjustor recommends settling the case for a certain amount, the case is forwarded to an evaluation consultant who reviews the adjustor's determination of coverage, liability, and amount. *Id.* at 9. If the evaluation consultant concurs in the determination, then he or she authorizes the recommended offer. *Id.* If the evaluation consultant disagrees or has a question about the recommendation, he or she may deny authorization outright or until the issue is resolved. *Id.* at 111, 142.

When the records and billing of a provider raise suspicions in the mind of an adjustor or evaluation consultant, that person may refer the file to the Special Investigations Unit (SIU). *Id.* at 23. Suspicions that might trigger referral in a personal injury case include miscoding and upcoding of treatments, "unbundling" of treatments that should be coded as a single treatment, and treatment by unlicensed personnel. *Id.* at 23, 54-55. Community's billing was referred to SIU as early as April 2004. Ex. GG, BSN 11125.

SIU employs field analysts who wield authority to retain counsel for purposes of filing lawsuits against service providers suspected of fraud. Tr. vol. 4, 119. Allstate filed suit in this case on December 12, 2008, raising claims of fraud and unjust enrichment, after conducting an internal review of Community's files between August 2007 and August 2008. *Id.* at 137; Rec. Doc. 1; *see also* Rec. Doc. 238 (First Amended Complaint). Community answered, denying the accusations while counterclaiming for defamation and racial discrimination. Rec. Doc. 35 & 331.

## III. CONTENTIONS OF THE PARTIES

Allstate claims that defendants defrauded them by sending billing for services that were not performed by the persons indicated, were not performed at all, or did not comply with the standards of the medical and, significantly, medical billing communities. Rec. Doc. 453. The Company claims that this practice was designed to allow defendants to obtain payment for directing a fleet of untrained, uncertified technicians to administer unnecessary therapy to accident victims with questionable claims of injury. *Id.* at 19-20. Allstate seeks to recover for intentional, direct misrepresentation, as well as negligent misrepresentation and fraud by silence or omission. Rec. Doc. 443, ¶¶ A.4-A.6.

Allstate specifically claims that representations within the following documents were materially false and relied upon to the Company's detriment:[2]

- Typewritten initial evaluations and medical narratives that state that they were "dictated not read" by a physician are fraudulent because they were not dictated by the physician indicated.

---

[2]After trying in vain to have Allstate distill its ungainly list of 32 overlapping fraud allegations into a single coherent set complying with Fed. R. Civ. P. 9(b), *see* Rec. Doc. 229, the Court made its own attempt based on Allstate's proposed findings of fact. Rec. Doc. 443, ¶B.16. Insofar as the Court's listing omits an allegation contained in those proposed findings, it did not warrant full analysis.

- Typewritten evaluations and billing for physician visits are fraudulent because evaluations were conducted by untrained technicians.

- Prescriptions for medication and orders for imaging signed with a physician's stamp were fraudulent because they were not stamped by the physician or with his consent.

- Modality billing was fraudulent because:

  - the therapies billed for were generally not medically necessary;
  - uncertified technicians performed modalities without physician oversight or a valid therapy prescription;
  - technicians performed modalities for less time than billed;
  - it relied on forged, photocopied, or otherwise doctored treatment notes; and
  - Community selected the wrong code for treatments actually performed.

- Liens and lien notices were fraudulent because Community was not a "certified health care facility" within the meaning of La. Rev. Stat. 9:4751, *et seq.*

- Forms and letters indicating that Community offered "physical therapy" were fraudulent because Community did not employ a physical therapist.

Finally, insofar as Allstate is not entitled to recover in tort, the Company argues that it is entitled to recover for unjust enrichment based on Community's profit from furnishing substandard, non-compensable services. Rec. Doc. 443, ¶ A.16.

Defendants answer that plaintiffs' fraud allegations have prescribed. To the extent that any claim is not prescribed, defendants argue that they have committed no fraud because Community had sufficient physicians and technicians to administer the care represented in the billing. The only evidence of fraud, they contend, is speculative or lacking in credibility so as to render it unpersuasive. They defend their care and billing as ultimately imperfect but in no way intentionally fraudulent.

In their counterclaim, defendants Kathy and Leon Hampton claim against Allstate in tort

for its behavior in investigating and initiating this lawsuit. Rec. Docs. 35 & 331. They argue

Allstate's scrutiny and the scandalous accusations of fraud have adversely affected Community's

business. Rec. Doc. 455 at 30-31. Most recently,[3] defendants have argued that these facts give

rise to claims for defamation and tortious interference with business. Rec. Doc. 383 at 6; Rec.

Doc. 455 at 30.  Allstate argues that defendants' counterclaims are not supported by any

competent trial evidence. Rec. Doc. 453 at 27-28.

## IV. ANALYSIS

## A. Claim 1: Fraud/Misrepresentation

## 1. Affirmative Defense: Prescription

Defendants have properly raised the affirmative defense of prescription. Rec. Doc. 35 at

7; Rec. Doc. 455 at 3; *see Combee v. Shell Oil Co.*, 615 F.2d 698, 700 (5th Cir. 1980) (noting the

applicability of Fed. R. Civ. P. 8(c) pleading requirements to the defense of prescription).

Ordinarily, the party raising the defense of prescription bears the burden of proof at the trial.

*Carter v. Haygood*, 04-0646 (La. 1/19/05), 892 So. 2d 1261, 1267 (citing *Campo v. Correa*, 01-

2707, p. 7 (La. 6/21/02), 828 So.2d 502, 508). "However, if prescription is evident on the face of

the pleadings, the burden shifts to the plaintiff to show the action has not prescribed." *Id.*

In Louisiana, the nature of the cause of action determines the applicable prescriptive

---

[3]Defendants' final amended complaint before trial failed to mention tortious interference and instead included the claim for discrimination that Allstate addresses in its post trial briefing. Rec. Doc. 331 at 6; Rec. Doc. 453 at 27. Defendants have waived their discrimination claim by failing to incorporate it into the pretrial order. *See Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 206 (5th Cir. 1998) ("Once the pretrial order is entered, it controls the course and scope of the proceedings under Federal Rule of Civil Procedure 16(e), and if a claim or issue is omitted from the order, it is waived, even if it appeared in the complaint."). The Court will address the merits of defendants' tortious interference claim because Allstate raised no objection to its inclusion in the pretrial order.

period. *Terrebonne Parish School Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 886 (5th Cir.2002). This case involves a series of alleged misrepresentations that Allstate claims led to compromises in personal injury cases against its insured. Under Louisiana law, an intentional or negligent misrepresentation may give rise to an action in both contract and tort, provided there is privity between the parties. *Clark v. Constellation Brands, Inc.*, 348 F. App'x 19, 21 (5th Cir. 2009). With respect to contracts, fraud is a vice of consent that gives rise to a remedy of rescission as well as damages and attorneys fees. La. Civ. Code arts. 1953, 1958; *Clark*, 348 F. App'x at 21. The tort of fraud is subject to one-year prescription beginning from the date of injury. La. Civ. Code art. 3492. An action to annul a contract for fraud prescribes in five years. La. Civ. Code art. 2032.

Allstate presents a mixture of claims in this case, some of which possess, and some of which lack, the requisite contractual privity to sustain a cause of action in contract. Because Community asserted claims against Allstate as a lienholder and a check can suffice to evidence a contract of compromise, Allstate has a theoretical cause of action in contract to recover settlement amounts paid to Community or Mid-City Imaging directly in any check that "recites that it is in full payment for all claims and . . . is endorsed and negotiated." *Jerome v. Duggan*, 609 So. 2d 1119, 1124 (La. App. 2 Cir. 1992); *accord* La. Civ. Code arts. 3071-72. A small minority of Allstate's claims (about 10%) fall into this category. *Compare* Ex. C (payments to Community or Mid-City Imaging) *and* Ex. N (payments to accident victims and/or their attorneys only). Nevertheless, it is appropriate to classify all of Allstate's claims as tort claims because Allstate has relied on a single theory of recovery.

The nature of a claim depends on the nature of the duties breached by the defendant's

alleged conduct. *Copeland v. Wasserstein, Perella & Co., Inc.*, 278 F.3d 472, 479 (5th Cir. 2002). Contractual claims leverage special duties owed by virtue of the contractual relationship. *Id.* Allstate has not claimed that Community owed special duties in cases in which it purported to settle with Allstate directly.[4]

Having established that one-year prescription applies to all of Allstate's claims, the burden of proof remains with the defendants on this issue because the pleadings do not reveal that more than one year has passed since Allstate manifested an injury from defendants' alleged fraud. Allstate's complaint does not reveal the date on which any of the checks issued in settlement were paid. *Cf. AGEM Mgmt. Servs., LLC v. First Tennessee Bank Nat. Ass'n*, 942 F. Supp. 2d 611, 619 (E.D. La. 2013). Further, it alleges that Allstate discovered the "extent and severity of [defendants'] continuing fraud on August 2008." Rec. Doc. 1, ¶ 18.

Allstate's complaint was filed for service on all defendants, thereby interrupting any prescription on these claims, on December 12, 2008. Rec. Doc. 1; La. Civ. Code. art. 3462. Therefore, to satisfy their burden of proof on prescription, defendants must prove that Allstate sustained injury from its alleged fraud before December 12, 2007, if at all.

Further, defendants must show that Allstate knew or should have known of its fraudulent acts before December 12, 2007. *AGEM Mgmt. Servs., LLC*, 942 F. Supp. 2d at 619. Prescription begins to run against a plaintiff once he acquires "actual or constructive knowledge of facts indicating to a reasonable person he or she is the victim of a tort." *Jenkins v. Starns*, 11-1170 (La. 1/24/12), 85 So. 3d 612, 620 (citations omitted). "Constructive knowledge is whatever

---

[4]The Court expresses no opinion regarding whether such duties actually existed or, if they did, whether they would actually affect any conclusion reached in this opinion.

notice is enough to excite attention and put the injured party on guard and call for inquiry. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead." *Campo v. Correa*, 01-2707 (La. 6/21/02), 828 So. 2d 502, 510-11. The ultimate issue is the reasonableness of the plaintiff's inaction in light of relevant circumstances, including education, intelligence, and nature of the defendant's alleged misconduct. *Kling Realty Co., Inc. v. Chevron USA, Inc.*, 575 F.3d 510, 517 (5th Cir. 2009); *Marin v. Exxon Mobil Corp.*, 09-2368 (La. 10/19/10), 48 So. 3d 234, 246. Determining the when a plaintiff receives fair notice of his claim is a fact-sensitive inquiry. *Bailey v. Khoury*, 04-0620 (La. 1/20/05), 891 So. 2d 1268, 1284.

With respect to date of injury, the settlement checks introduced by Allstate to prove its losses establish that the vast majority were issued and deposited well before December 12, 2007. There are only 16 settlements at issue in this case that were confected within one year of date on which the above-captioned fraud case was filed.[5]

Regarding notice, Community relies heavily on documents revealing that SIU had been investigating Community since 2004. In that year, Community was referred to SIU "for possible billing on dates when the office is closed and the use of 'boiler plate' medical reports." Ex. GG, BSN 11125. The reason for investigation was that one of these "boiler plate" reports, attributed to Dr. Nedra Jackson, indicated that a 4 to 6 year old took medication appropriately, handled finances, used the phone, shopped, and prepared meals. *Id.* The referral led SIU to conduct a

---

[5] Payment on these claims is reflected in Exs. C & N, BSN 10595, 10597, 10730, 10732, 10882, 10783, 10781, 10778, 10776, 10774, 10771, 10770, 10706, 10660, 10635, 10592, 10578, 10544, 10505, and 09957.

comprehensive review of Community's files for indicative patterns, which it apparently completed on December 3, 2004. *Id.* This review revealed a "consistent pattern of upcoding and unsupported/unnecessary treatment." *Id.* Despite these findings, the analyst recommended that the Company "continue to monitor cases and compromise cases based on treatment issues." *Id.* As the evidence has shown, Allstate continued to compromise cases, all while requesting more and more records from defendants to obtain payment. Tr. vol . 4, 235.

By July 13, 2006, Latia Johnson's claim, which is at issue in this case, had also been referred to SIU under suspicion for billing on dates when the clinic was closed. Ex. HH, BSN 11132-33. The investigator concluded that defendants has overbilled for evaluations conducted by nurses and also that they were billing for treatments conducted at times when the clinic was closed. *Id.* Yet the EC writing the report determined that no further investigation was warranted and that an offer should be placed on the claim because the claim was brought in a "poor venue for a defense." *Id.* The report goes on to state that the case will be heard by a judge with no jury and that state law does not allow them to reduce the bill unless it is shown to be fraudulent and that the patient was a part of the fraud. *Id.* The evidence shows that after this claim was resolved, Allstate continued to monitor Community's billing and settle its cases.

Finally, in February 2007, Allstate contacted Catia Monforton-Farris to investigate Community's claims and billing. Tr. vol. 1, 137. Ms. Monforton-Farris reviewed Community's files with Allstate at least until March of 2007, at which point she engaged plaintiffs' counsel because she "felt she needed some assistance." *Id.* After that point, Ms. Monforton-Farris continued to investigate. Counsel facilitated the investigation by contacting and deposing witnesses. Allstate deposed Dr. Williams at least twice: once on June 15, 2007 and once on

September 7, 2007. Tr. vol. 1, 95, 99. Among his revelations during those depositions were the accusations made in this case that Kathy Hampton had used his prescription pad without permission, *id.* at 96, and the accusation that Kathy Hampton had burned Community's patient sign-in sheets in an apparent effort to conceal when patients were seen at the clinic, *id.* at 100.

Against this backdrop, the Court finds that Allstate had actual or constructive knowledge of every kind of fraud in this case by September 7, 2007, the time of Dr. Williams's second deposition. Their 2004 file review should have confirmed any suspicion about the extent of boiler plating in the defendants' typewritten reports. Roughly 60 of the 200 claims at issue in this case were paid before Allstate concluded that 2004 file review. Exs. C & N. Even if Allstate's adjustors lacked the medical expertise to dispute the likelihood of a particular finding in a certain number of cases, the verbatim language should have, and appears to have been, a tell-tale sign that these records were not the genuine recitations of a practicing physician.[6]

That same file review should have revealed the presence of forged and photocopied technician signatures. The instances of such conduct that Allstate has confirmed with Robert Foley's expert opinion were fairly obvious to the naked eye. In Earnest Johnson's file, for instance, whomever did the photocopying copied everything but the date, including the hand-written observations about the patient. Ex. A, BSN 02488-02499. As for the less obvious cases, in which only the technician signature was reproduced, even Drs. Williams and Jackson, who lacked any document examination expertise or familiarity with the documents, were able to identify indications of photocopying from the witness stand. Tr. vol. 1, 44-46, 126-27. Allstate

---

[6]This further suggests that a false impression of the authenticity of Community's typewritten reports and narratives was not a substantial factor in the authorization of settlements in this case.

might not have been able to tell which was the authentic Kenneth Jackson signature. Still, it was possible to tell that his signature was wildly inconsistent in documents within the same file. *See, e.g.*, *id.* at 02591-54. The circumstances do not suggest that Allstate used anything other than the naked eye to determine which files to send to Mr. Foley in the first place. Given when it occurred, Allstate's 2004 file review should have included a number of the files that Allstate ultimately submitted to Mr. Foley before the trial in this matter. *See* Ex. G.

The 2004 file review should have revealed the pervasive use of physician stamps on various documents. The stamp used on Dr. Williams's MRI orders, while consistent with Dr. Williams's handwriting, is inconsistent with the way Dr. William's signed his name to other documents within the same files, in that the stamps have his entire first and last name spelled out. The stamp on the MRI order sits high above the signature line and has stray marks in and around the signatures consistent with the application of a stamp. Dr. Jackson's stamp was much neater than her handwriting. Even if this was insufficient, Dr. Williams actually testified at a deposition that his stamp was used without permission.

Finally, Allstate's 2004 file review should have given it an indication that Community's treatment's were improper or unbillable in the ways alleged in this lawsuit. Allstate should have been able to discern then that Dr. Williams and Jackson's names had been stamped onto prescriptions, indicating the possibility that they were absent from the clinic at the time of issuance. Allstate also had in its possession proof that the application of modalities frequently varied without rhyme, reason, or written approval from the physician. Allstate has argued this precise issue is strong evidence of lack of physician supervision. Rec. Doc. 453 at 15. Allstate possessed evidence that Community's evaluations were being performed increasingly by nurse

practitioners but billed as physicians. Ex. HH, BSN 11132-33.

In light of the foregoing, there can be no doubt that Allstate had meaningful notice and actionable evidence of fraud on September 7, 2007, 18 months before it filed suit in this case. Allstate has suggested that it only acquired notice on August 2008 when Ms. Monforton-Farris concluded her investigation. Rec. Doc. 443, ¶ B.115; Tr. vol. 4, 137. However, the only steps in the process that Ms. Monforton-Farris described were conducting a comprehensive review of Community's files and public records and later contacting counsel. *Id.* In this way, Allstate fails to differentiate her investigation from the 2004 investigation.

Allstate's attempt to rely on the "extent" or "severity "of defendants' fraud to avoid a prescription is unavailing. As the analysis below reveals, the defendants' fraud was less, and not more, extensive or severe than Allstate originally supposed. Moreover, the extent and severity of defendants fraud would not excuse Allstate's delay unless it were claiming for a kind of fraud that it had no reason to expect based on the indications of fraud available. *Cf. Campo*, 828 So. 2d at 510-11. Allstate has not claimed for any kind of fraud that it should not have expected given what its files and Dr. Williams revealed.

Allstate finally suggests that it has not committed any inexcusable delay insofar as defendants' fraud has been a tort of omission that has continued by virtue of its failure to properly advise regarding its fraudulent practices. Rec. Doc. 443, ¶¶ A.4-A.5, B.115. A tort that is continuous in nature suspends the prescriptive period until the conduct causing the damage is abated. *Terrebonne Parish Sch. Bd.*, 290 F.3d at 323; *see also Kling Realty Co., Inc. v. Chevron USA, Inc.*, 575 F.3d 510, 518 (5th Cir. 2009) ("When the damaging conduct continues, prescription runs from the date of the last harmful act."). "[A] continuing tort is occasioned by

[continuing] unlawful acts, not the continuation of the ill effects of an original, wrongful act.'"

*Young v. United States*, 727 F.3d 444, 448 (5th Cir. 2013). (quoting *Crump v. Sabine River Authority*, 737 So.2d 720 (La. 1999)).

A continuing tort requires a continuing duty and a continuing breach of that duty by defendants. *See Kling Realty Co.*, 575 F.3d at 519 (quoting *Crump*, 737 So.2d at 728). An affirmative duty to disclose information is usually considered continuing for these purposes. *Bunge Corp. v. GATX Corp.*, 557 So. 2d 1376, 1383-84 (La. 1990). However, as discussed below, Allstate fails to establish that defendants owed such an affirmative duty. *See* section IV.2.B.i ("Misrepresentation by Silence or Omission"); *compare Scott v. Am. Tobacco Co., Inc.*, 04-2095 (La. App. 4 Cir. 2/7/07), 949 So. 2d 1266, 1280 ("a fraud conspiracy" constituted a continuing tort because the defendant had breached a continuous affirmative duty to speak about the addictive properties of nicotine) *with Nat'l Council on Comp. Ins. v. Quixx Temp. Servs., Inc.*, 95-0725 (La. App. 4 Cir. 11/16/95), 665 So. 2d 120, 123 (action for negligent misrepresentation in purchase of worker's compensation policy not delayed by continuing tort doctrine). The only viable claims in this case involve active, as opposed to passive, misrepresentations. For those claims, a separate cause of action for intentional or negligent misrepresentation accrued each time Allstate issued payments on the basis of false information provided by defendants.

Prescription began to run on Allstate's claims of fraud on September 7, 2007 at the latest. Claims accruing afterward began to prescribe immediately when, and insofar as, Allstate issued payments on the basis of Community's records. Therefore, the only claims that are recoverable in this case are those that were paid on or after December 12, 2007, i.e., one year before Allstate

filed this action. As stated, Allstate has only presented 16 such claims. The remaining prescribed cases are only relevant to this matter insofar as they evidence a pattern that was active at the time that patients who filed those 16 unprescribed claims were evaluated and treated. Where defendants have successfully corrected matters that were misrepresented in previous billing, Allstate will have no cause of action.

## 2. Standards for Analysis

Under Louisiana law, the elements of a claim for intentional misrepresentation are: "(a) a misrepresentation of a material fact, (b) made with the intent to deceive, and (c) causing justifiable reliance with resultant injury." *Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619, 627 (5th Cir. 1999). Intent to deceive, like any other tortious intent, may be inferred from the totality of circumstances surrounding the act itself. *See Cousin v. Page*, 372 So. 2d 1231, 1233 (La. 1979). However, intent to deceive cannot be inferred absent evidence of the defendants' actual knowledge of the falsity of a representation. *Id.*

An action for negligent misrepresentation will lie where there is (1) a duty on the part of the defendant to supply correct information; (2) a breach of that duty, which can occur by omission as well as by affirmative misrepresentation; and (3) injury to the plaintiff's caused by his reasonable reliance on the misrepresentation. *Kadlec Med. Ctr.*, 527 F.3d at 418. The existence and scope of a duty to supply correct information is a question of law to be decided by the Court based on Louisiana's duty/risk formula. *Barrie v. V.P. Exterminators, Inc.*, 625 So. 2d 1007, 1015 (La. 1993).

To establish fraud or negligent misrepresentation, Allstate must prove by a preponderance of the evidence that its employees relied to the Company's detriment on any

misrepresentation that the evidence establishes. This requires a Allstate to show not only that its employees took matters misrepresented into account in authorizing settlements, but also that such matters were a "substantial factor" in bringing about the decision to settle or the amount of settlement. *Granger v. Christus Health Cent. Louisiana*, 12-1892 (La. 6/28/13), – So. 2d –; *see also Sun Drilling Products Corp. v. Rayborn*, 00-1884 (La. App. 4 Cir. 10/3/01), 798 So. 2d 1141, 1153 ("for fraud or deceit to have caused plaintiff's damage, he must at least be able to say that had he known the truth, he would not have acted as he did to his detriment. Whether this element is labeled reliance, inducement, or causation, it is an element of a plaintiff's case for fraud.") (citing *In re Ford Motor Company Vehicle Paint Litigation*, 1997 WL 539665 (E.D. La. 8/27/97)).

Allstate must show that the matters misrepresented were a "substantial factor" in an injurious settlement decision by its adjustors and ECs. Allstate's primary contention and the basis of its damages calculation is the argument that, but for defendants' fraudulent records, its adjustors and evaluation consultants would not have paid any settlement at all in these cases. The Court will consider whether Allstate has proven this claim by a preponderance of the evidence after first analyzing Allstate's allegations of misrepresentation for fraud or negligence and threshold reliance.

Allstate must also show that any reliance was justifiable. While  justifiable reliance does not require a party to subject potential misrepresentations to "reasonable" scrutiny, Restatement (Second) of Torts § 545A (1977), it does prevent certain obvious misrepresentations from constituting torts. "The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him." *Id.*, § 541. Falsehood is

obvious if it can be discerned on "the slightest inspection." *Id.*

**3. Analysis of Specific Fraud Allegations**

<u>*a. Unsigned Doctor's Reports*</u>

Almost all requests for payment in this case were accompanied by either a typewritten initial evaluation or narrative, including some of the 16 unprescribed claims. Some files also have surgical evaluations. These documents were not signed by the physicians purporting to have examined the patient. *See generally* Ex. A. Instead, each evaluation and narrative states that it was "dictated but not read" by the physician with the initials of the apparent dictation-taker - for instance, kh, dfm, pt, lh, or llh - next to the physician's name. *Id.*

*i. Initial Evaluations and Narratives*

The initial evaluations purport to be the observations and impressions of a physician, which were dictated to a typist that prepared the initial evaluation report. They contain (1) history of the injury, (2) patient vital signs, (3) social history of the patient, (4) detailed, objective findings from physical, neurological, and orthopedic examinations, (5) physician diagnosis or impressions, and finally, (6) prescriptions and therapy recommendations.

Community's medical narratives purported to summarize the "history, diagnosis, treatment and prognosis" of the patient. They repeat the findings of the typewritten initial evaluation, further stating that each patient's past medical history was non-contributory. They conclude in a summary of treatments and a statement that the patient is being discharged, having achieved increased mobility, strength and comfort through the application of therapies described.

Drs. Williams, Jackson, and Bell have testified that they had no role in the creation of these documents; they also claim that they did not authorize the creation or submission of these

documents on their behalf.[7] Tr. vol. 1, 21, 116-19; Tr. vol. 4, 14-15. Dr. Jackson testified that she did not even compile final discharge narratives on patients she treated at Community. Tr. vol. 1, 146. Defendants have admitted that these reports were, at best, cobbled together using the physician's handwritten notes, patient intake forms, and an electronic template, as opposed to either dictated directly or using dictation equipment. Tr. vol. 2, 177-79; Tr. vol. 3, 243.

The typists typing the evaluations and narratives left certain information in the template even though it was not expressly reflected in the handwritten note. Tr. vol. 2, 190. As a result, these documents contain certain "boiler-plate" findings from testing that was never performed. *See, e.g.*, Tr. vol. 1, 145 (narrative contained results for tests Dr. Jackson had not performed). However, the evidence does not establish the precise scope of fabrication in these results. Jessica Woolridge, a former technician at Community, testified that the only things changed in the templates she typed were history of the injury and physician impressions and recommendations. Tr. vol. 4, 51-52. However, certain orthopedic findings in the typewritten reports apparently differ based on their handwritten counterpart - for instance, where muscle spasms are noted or where inability to perform or difficulty performing range of motion exercises is noted. *See* Ex. B, BSN 08543, 08545 (examination by Dr. Jackson's nurse; typed evaluation by "jw"); 08477, 08480. The findings that appear routinely fabricated across all documents include the "transferring" and coordination tests, examination of the extremities, the neurological examination, and the findings of the physical and/or HEENT examination. Tr. vol. 1, 24-26; Tr.

---

[7]Dr. Williams suggested, in his own careful way, that he was involved in the creation of this template but did not agree to its use outside of certain cases. Tr. vol. 1, 85. Ms. Hampton has accused Dr. Williams of creating the template. Tr. vol. 2, 184; in light of the template's contents, the Court can arrive at no other conclusion. It also appears that Dr. Jackson instructed Kathy Hampton to change the template after she discovered it was being used.

vol. 2, 90; *see also, generally*, Ex. A.

The clear purpose of using this template was, as Dr. Herring observed, to create the illusion that Community was providing higher quality, more sophisticated care than it actually was. Tr. vol. 2, 61-62. Even so, Allstate's <u>adjustors and ECs</u> gave no indication that they took this kind of puffing into account in determining settlement authorization. There is no indication that Allstate treated Community's claims any differently when it stopped using typewritten evaluations that misrepresented its diagnostic techniques. *See* Ex. A, BSN 05866-05933.

Based on the actual adjustor and EC testimony, the misrepresentation that these records were dictated by a physician could only have damaged Allstate where it used a false test result to substantiate a patient's claim of injury. *See, e.g.*, Tr. vol. 4, 6-7 (discussing uses of patient records). In this regard, Allstate has focused on the coded, alpha-numeric findings of the neurological examination, according to which no patient could lift his or her arms or legs against gravity and all patients had diminished deep tendon reflex. Rec. Doc. 453 at 13, 15. Tr. vol. 2, 12-14; Tr. vol. 3, 16-17; *see also, e.g.*, Ex. B, BSN 008646 (initial evaluation).[8] Allstate argues that this result misstated the extent of each patient's injury. Rec. Doc. 453 at 15. However, this argument misunderstands the way that adjustors use objective test results; they were "substantiating" injuries that were claimed or reported elsewhere, rather than searching for new ones. Tr. vol. 4, 7.

Further, Allstate has not proven that its employees understood how to interpret these

---

[8]Allstate has also made a belated attempt to attack the integrity of the soft-tissue injury diagnoses reflected in Community's evaluations and narratives. Rec. Doc. 453 at 13. The Court addresses this issue below, when analyzing whether defendants committed fraud by billing for unnecessary, unbillable treatment. *See infra* Section IV.A.3.d

results or, if they did, that they actually used them to determine the patient's neurological symptoms at the time of examination. Dr. Herring characterized the template result as inherently implausible to the trained eye even in a single case. Tr. vol. 2, 12-14. Dr. Cowen testified that a person relying on this result would believe that the patient was in need of urgent hospitalization, which never happened in any of these cases. Tr. vol. 3, 24. A person with this test result should have been immobilized throughout his evaluation, yet each evaluation reported the patient's ability to perform range of motion exercises in plain English. Ex. B, BSN 008646. The Court further notes that where Allstate's files from Community appear annotated, it is the orthopedic findings written in plain English that are circled or otherwise noted. *See, e.g.*, Ex. A, BSN 02146. The evidence does not persuade that Allstate's employees were ever misled by these false neurological findings.

Assuming that Allstate was ever misled by any of the fake findings of these reports - for instance, the finding that patients transferred from chair to bed and bed to chair with difficulty, Tr. vol. 2, 190 - Allstate must still prove that it relied on this misrepresentation in issuing payments in this case. The Court considers injury below.

*ii. Surgical Evaluations*

Allstate asks this Court to find that surgical evaluations submitted in defendants' files were fraudulent because they were "typed by Kathy Hampton." Rec. Doc. 443, ¶ B.67. This accusation has no merit. Dr. Williams admitted that he dictated some surgical evaluations at the request of a particular attorney, Lindsey Scott. Tr. vol. 1, 81, 84. Given his estimate of the number of such evaluations, that explanation could account for all of Lindsey Scott's clients in this case. Further, Dr. Williams often billed Allstate separately from Community for conducting

surgical evaluations. *See, e.g.*, Ex. A, BSN 00388. In Calvin Edwards's file where it appears that Community billed for the evaluation, Kathy Hampton did not even apparently participate in typing. Rather, it is someone with initials "xgt," who could have easily been associated with Dr. Williams's private practice. *Id.* at 01183. Having reviewed the content of the evaluations, the Court is unable to say that Ms. Hampton was even capable of producing it by herself. *Cf. id.* at 00290 (recommending epidural injections based on response to treatment and findings of MRI), 00391 (recommending surgery to remove herniated disc fragments identified in MRI). Dr. Williams offered no <u>specific</u> testimony claiming that he handwrote surgical evaluations. On the other hand, Ms. Hampton described a process whereby she faxed "information" to Dr. Williams at Southern, whereupon he dictated his findings over a telephone. Tr. vol. 2, 180. Dr. Williams was unwilling to deny that this happened for MRI results. Tr. vol. 1, 78.

The Court is unable to rule out Dr. Williams's personal involvement in the production of any typewritten surgical evaluation in this case based on the evidence presented. These records demonstrate neither fraud, nor intent to defraud, on Ms. Hampton's part.

### b. Technician Conducted Initial Evaluations

Allstate has alleged that Community allowed its untrained technicians to conduct the only initial evaluation that its patients received before beginning treatment. Rec. Doc. 453 at 19; Rec. Doc. 443, ¶ B.27, B.92. It follows that both the bill for such a visit, as well as the corresponding narrative, would be fraudulent. Allstate apparently claims this issue wherever defendants have not provided a signed initial evaluation narrative, including in some of the 16 unprescribed claims.[9] For various reasons, the Court does not find Allstate's evidence on this point is

---

[9] Ex. A, BSN 01598, 03587-89.

persuasive.

It was widely acknowledged that the physicians employed by Community did in fact evaluate its patients. Even Kari Lee spoke about having to put a patient in the copy room <u>to be examined by a doctor</u>. Tr. vol. 1, 160. The physicians that testified were unable to rule out, based on personal recollection, the possibility that they saw the patients at issue in this case. *Id.* at 83 (Dr. Williams); *id.* at 151 (Dr. Jackson).

Allstate's argument that certain patients were evaluated by technicians is based entirely on unreliable evidence. First, Elizabeth Bacon, a former Community employee who briefly assisted Ms. Hampton in the clinic's marketing, testified that she saw technicians performing the initial evaluations of Community's patients. Rec. Doc. 431 at 8, 18-23. Yet, Ms. Bacon struggled to identify an admissible basis for her conclusion that she was witnessing the patient's initial evaluation. She stated that she knew it was the initial evaluation because it was each person's first time at the clinic. *Id.* at 18. However, her basis for that testimony was first, that the technician would say it and, next, that Kathy Hampton would say it. *Id.* at 19. She later clarified that it was the technicians who told her they were performing the initial evaluations, and that she had never seen any of the paperwork associated with an initial evaluation. *Id.* at 20-21. Ms. Bacon clearly lacked proper foundation for the testimony that Allstate seeks to introduce. Fed. R. Evid. 602. None of the technicians who testified offered support for Ms. Bacon's accusation. The technicians were generally very forthcoming about Community's dishonest practices, even where it undermined their own integrity. *Cf.* Tr. vol. 1, 161, 164-65 (Kari Lee signing for ultrasounds that she did not perform).

The Court gives little weight Dr. Williams and Dr. Jackson's attempt to deny having

examined patients whose files were missing handwritten initial evaluations. Rec. Doc. 453 at 3; Tr. vol. 1, 21, 116. Accepting that it was the practice of Community's physicians to handwrite notes from their evaluations onto patient charts, Allstate has not ruled out every other reasonable hypothesis for why the clinic's handwritten charts are missing for certain cases. *See Lacey v. Louisiana Coca-Cola Bottling Co., Ltd.*, 452 So. 2d 162, 164 (La. 1984). It has not ruled out the possibility that Dr. Williams absconded charts when he came under scrutiny from law enforcement, as Ms. Hampton alleged. Tr. vol. 3, 192.[10] The Company further has not ruled out that any given handwritten evaluation missing from a file was a casualty of the general disarray in which the office was kept. *See* Tr. vol. 5, 37 (describing disorganization of x-rays). In light of the many inaccuracies that Dr. Williams advanced in his testimony, the Court cannot rule out the possibility that he was wrong in claiming that he handwrote the findings of his initial evaluations into patient charts. Given his awareness that Community was using evaluation templates, Tr. vol. 1, 85, 106-07, the Court cannot rule out the possibility that he planned to rely on those templates for records purposes, thus failing to maintain any handwritten notes.

Finally, the Court must reject this accusation, because it is frankly hard to imagine that defendants could have participated in such serious misconduct without raising the suspicion and condemnation of its physicians. Community's physicians have each testified that they had no idea such improper behavior was taking place. Tr. vol. 1, 155. And yet, for some of the patients whose files are at issue in this case, it seems impossible that they would not be aware.

For instance, if Dr. Williams did not evaluate Tarrance Alex on October 28, 2003 for an

---

[10] Dr. Williams did in fact plead guilty in connection with "sign[ing] some medical records." Tr. vol. 1, 102-103. This bears on the credibility of his accusations, as discussed below.

accident 10 days earlier, then there is no explanation for his hand-signed Lortab prescriptions on October 28 and November 11, both before Dr. Williams's first handwritten, hand-signed evaluation form on November 25, 2003. *See* Ex. A, BSN 74-75 (undisputed 2003 prescriptions by Dr. Williams); *id.* at 00060 (handwritten follow-up evaluation note). Allstate has not challenged the authenticity of either prescription. Rec. Doc. 443-1 at 2. Even if Dr. Williams were to disavow writing the prescriptions, there is still no reason for him to have written a "follow-up" examination when there was no handwritten initial evaluation in the file.

This is one example. However, many of Allstate's files from Community contain some indication of physician involvement in care - a prescription or a handwritten follow-up evaluation - that would have alerted the physician to the lack of initial evaluation. It follows that something else must explain the absence of the handwritten chart - definitely in these cases, but possibly in the others where there is no handwritten indication of physician involvement in care. In light of this fact, Allstate has not met its burden on this issue.

*c. Stamped Prescriptions, MRI Orders, and Returns to Work*

Where Community submitted whole patient files to Allstate for billing purposes, some of these files contained separate handwritten prescriptions for medication and referrals for patient MRIs. Community has also sent Allstate copies of letters purporting to be from its physicians, releasing patients to return to work or school.

The Court heard testimony and received a report from Robert Foley, an expert in forensic document examination, that particular files he reviewed contained stamped prescriptions, MRI orders, and returns to work. Ex. G; Tr. vol. 2, 95. Dr. Williams confirmed that he had three professional stamps and identified them on documents in this case. Tr. vol. 1, 94. He testified

that he intended for his stamp to remain in his Dijon Road office. *Id.* at 97. Dr. Jackson

confirmed that she had professional stamps and identified them on multiple prescriptions and an

MRI order in this case. *Id.* at 129-32. Dr. Jackson insisted that she did not use a stamp for such

documents and that it would have been improper for her nurse practitioners to do so. *Id.* She

likewise claimed that she did not even know that her stamps were being used at Community. *Id.*

at 132, 143.

Allstate claims that it was defrauded by the submission of numerous documents stamped

in both Dr. Williams and Dr. Jackson's name without either doctor's consent. Rec. Doc. 453 at

5-6, 20. Allstate claims that prescriptions and MRI orders were fraudulent either because they

were illegally issued to patients or because they were presented to Allstate without having been

issued to the patient at all. *Id.* As with other claims in this case, Allstate's proof of

misrepresentation is incomplete.

*i. Prescriptions*

Because of the potential for criminal consequences, Ex. E, BSN 10026; Tr. vol. 1, 48,

129, Allstate's allegations of improperly stamped prescriptions for medication are the gravest in

this case. After reviewing the evidence, the Court is deeply disturbed by Allstate's attempt to

implicate Ms. Hampton personally in this practice, given the flimsy foundation for these

accusations.

*- Dr. Williams*

Allstate's argument that defendants used Dr. Williams's stamp to improperly issue or

fabricate prescriptions depends chiefly on Dr. Williams testimony that he did not place his stamp

or authorize it to be placed on any prescription at Community. *Id.* at 99. After careful review of

the files in this case, the Court is not able to credit his testimony. Indeed, Allstate's designation of allegedly fraudulent prescriptions tends to undermine rather than support Dr. Williams's testimony.

For example, Allstate claims that an 800 mg Motrin prescription apparently issued to Calvin Edwards at his initial evaluation on June 10, 2005 was fraudulent.  Rec. Doc. at 443-2 at 2; Ex. A, BSN 01184, 01218. Yet, the Court cannot conclude that this was a mere decoy because Dr. Jackson's Nurse, Luella Jackson, issued a "re-fill" on the prescription on June 17 and wrote it on her handwritten evaluation form. *Id.* at 01196, 01294. Allstate has not argued, nor is there any evidence, that this form is a fake. It makes little sense for Community to have gone to such elaborate lengths to submit a fake Motrin prescription when the patient was unquestionably prescribed, a variety of drugs, including a narcotic, later on in treatment. *Id.* at 01194-95, 01291, 01293.

For similar reasons, the Court cannot conclude that the prescription was made without Dr. Williams's knowledge or permission. The Court cannot fathom that Dr. Williams, Dr. Jackson, or Dr. Jackson's nurse were so lazy, oblivious, or ethically compromised as to ignore a prescription improperly issued, when they were prescribing dangerous medications to a patient. *Cf.* Tr. vol. 1, 133 (Dr. Jackson testifying about the dangers of prescribing narcotics).

As such, it seems much more likely that Dr. Williams, contrary to his testimony at trial, authorized someone to stamp this prescription. Such behavior would be consistent with the belief implied by elsewhere in his testimony that it was lawful to stamp non-narcotic, non-schedule prescriptions. Tr. vol. 1, 48. Dr. Williams admitted that Nurse Hazel White worked "with" him during his time at Community. *Id.* at 75. Ms. Hampton testified that the Nurse White prescribed

34

medication when she saw patients for Dr. Williams. Tr. vol. 2, 228. Although Ms. Hampton testified that she did not believe Nurse White used his stamp, *id.*, no one in this case seems to know from recollection. Tr. vol. 1, 95.

Nurse White's involvement also better explains Alfreda Jackson's stamped prescription for Lortab that Allstate insists was fraudulent. Rec. Doc. 453 at 5. Dr. Williams previously accused Ms. Hampton of stamping this prescription without his knowledge or permission; however, at trial he testified he could not be certain. Tr. vol. 1, 48. The prescription is dated July 30, 2004, the same apparent date as Ms. Jackson's initial evaluation at Community. Ex. A, BSN 02242, 02340. The handwritten chart for the evaluation indicates a "prescription given per Dr. Williams," undermining Allstate's fabrication theory. *Id.* at 2340. The typewritten initial evaluation, which was not initialed by Kathy Hampton, also reflects that a prescription for Lortab was given at that time. *See id.* at 2339 (initialed "pt"). The typewritten narrative reflects the same prescription. *Id.* at 02336 (initialed "dfm"). Dr. Williams later participated in a follow-up evaluation, evidenced by handwritten document, on December 5, 2004. *Id.* at 02238. Finally, the file contains an authentic[11] surgical/neurological examination from Dr. Williams. *Id.* at 02198. Both the follow-up and surgical evaluations make reference to Ms. Jackson's treatment regimen, indicating at least a passing glance at her chart and files. *Id.* at 02198, 02238. Against this backdrop, the Court does not conclude that Kathy Hampton, or anyone else, stamped this prescription without Dr. Williams's consent. Dr. Williams would have realized during the course

---

[11]Alfreda Jackson was represented by Lindsey Scott, whom Dr. Williams testified was privileged enough to receive valid typewritten surgical evaluations reflecting his personal participation. Ex. A, BSN 02186; Tr. vol. 1 at 81, 84, 85. Dr. Williams also billed separately for her surgical evaluation. Ex. A, BSN 02185.

of treatment and taken action, if for no other reason than to limit his own potential liability.

In its post-trial appendix of fraud claims, Allstate points to a single case in which its theory of improper or fake prescription is plausible. *See* Ex. A, BSN 01464. However, Dr. Williams's credibility has been too badly compromised to be credited even in this instance, especially in light of his attempt to deny use of his stamped signatures to procure MRIs (*see* below). The Court also notes that Dr. Williams is under continuing threat of professional and criminal sanctions for previous acts of misconduct and that he has attempted to disavow his signatures on prescriptions in this case that Allstate's handwriting expert found <u>were actually genuine</u>. Tr. vol. 1, 101-102; Ex. G, BSN 10065. All of these factors suggest that vindictiveness toward Ms. Hampton or eagerness to avoid further penalty has affected Dr. Williams' testimony in this case; therefore, the Court cannot credit Dr. Williams' accusations against Ms. Hampton. These claims have no merit.

*- Dr. Jackson*

Dr. Jackson testified that she approved prescriptions recommended by her nurse practitioners after reviewing the charts that they prepared. Tr. vol. 1, 143. She testified that her nurse practitioners would write prescriptions in their own names and sign them personally, save narcotic prescriptions which only Dr. Jackson could, and did, sign. *Id.* She admitted that it was possible that one of her nurse practitioners (of which there appear to have been four, not two as Dr. Jackson testified, *see generally* Ex. A; Tr. vol. 1, 140; Tr. vol. 4, 195) used her stamp on a prescription against her wishes. Tr. vol. 1, 149.

The records support that it was Dr. Jackson's nurses who used her stamp. This is sufficient to persuade the Court that these prescriptions were not merely "for show." On the

other hand, the rest of Dr. Jackson's story is not supported, leading the Court to conclude that Dr. Jackson was not forthcoming about her awareness of the use of her stamp.

First, the Court finds no evidence in the records that Dr. Jackson's nurses ever signed their own names to non-narcotic prescriptions. On the contrary, her nurses appear to have stamped her name in these instances, even when Dr. Jackson did not sign off on their charts. *See* Ex. A, BSN 00970-71 (stamped Motrin prescription corresponding to evaluation conducted by Nurse Hughes); *id.* at 01209, 01274 (Motrin/Flexeril corresponding to evaluation by Nurse Luella Jackson); *id.* at 03300, 03302 (Ultracet/Flexeril corresponding to evaluation by Nurse Luella Jackson). Dr. Jackson appears knowledgeable of this practice because she worked on and prescribed drugs in the same cases. *Id.* at 01272.

Most importantly, where Dr. Jackson has signed off on a recommendation for a narcotic prescription charted by her nurses, there are stamped, as opposed to originally signed, prescriptions in the files. *See, e.g.*, Ex. B, BSN 08506-07. Because narcotic prescriptions require a doctor's signature, it can be inferred that Dr. Jackson knew her nurses were stamping her name or in some other way reproducing her signature, when they recommended the narcotic but did not ask her to sign for it.

As with Dr. Williams, there are certain files where it is plausible that Dr. Jackson would not be aware that her stamp was being used. *See* Ex. A, BSN 02873, 04103. Nevertheless, Dr. Jackson's testimony has been sufficiently undermined to be deemed generally unreliable for these purposes. For this reason, the Court cannot conclude that Dr. Jackson did not know or agree to the use of her stamp, as apparently happened in this case. Accordingly, Allstate has not proven that any of the prescriptions identified were presented under materially false pretenses.

*ii. MRI Orders*

Ms. Hampton testified that Dr. Williams's assistant provided her prestamped copies of MRI orders to use with Dr. Williams's permission. Tr. vol. 2, 231. Dr. Williams would not deny under oath that while working at Southern University, defendants faxed him patient charts for him to approve MRI orders remotely. Tr. vol. 1, 78, 98. After reviewing the examples cited by the Allstate, the Court cannot conclude that any were issued without Dr. Williams's awareness or permission.

In Latia Johnson's file, there is a stamped MRI order dated April 22, 2005. Ex. A, BSN 02554. The MRI is noted by hand on the patient's follow-up evaluation by Dr. Williams on July 12. *Id.* at 2522; *see also id.* at 00789, 00792 (same for Vanessa Collins); 04379, 04382 (same for Bonnie Robinson). In Katherine Williams's file, the MRI order is both stamped and charted. *Id.* at 05694. The fact that Calvin Edwards received an MRI is noted on his patient chart by Nurse Jackson; the chart is signed by Dr. Jackson. *Id.* at 01188. The Court has already documented the circumstances that indicate Dr. Williams's involvement in Alfreda Jackson's MRI. In Adam Day's file, the MRI results are directed to Dr. Williams's separate office. *Id.* at 00953. Under the circumstances, there is no way that Dr. Williams did not know his name was used to procure these MRIs. He also knew when an MRI was ordered that he did not have to sign to receive it. In light of this fact, Dr. Williams' stamp was not used to deceive Allstate about his involvement in the referral process.[12]

---

[12]Allstate separately claims that the MRIs ordered were not necessary according to CPT requirements, even assuming that they had Dr. Williams's support. Rec. Doc. 453 at 13. The Court addresses this issue below, when analyzing whether defendants committed fraud by billing for unnecessary, unbillable treatment. *See infra* Section III.A.4.d

*iii. Returns to Work*

What have been described as returns to work and school are letters purporting to be from Drs. Williams and Jackson authorizing a Community patient to resume work or school. The letters contain a statement that the patient has been under a doctor's care. Dr. Williams would not deny authorizing someone to stamp these letters on his behalf. Tr. vol. 1, 98. Dr. Jackson admitted to authorizing stamps for returns to work and school but claimed that this was only done in her private practice. *Id.* at 142. In light of this testimony, the Court does not find that these returns to work were provided to Allstate under false pretenses. There is no evidence to suggest that these letters did not originate in the private offices of both doctors.

*d. Unbillable Treatments*

Community used CPT codes in its itemized billing for patient modality treatments. *See generally* Ex. A. The use of CPT codes for billing is governed by the Physical Medicine and Rehabilitation Guidelines. Tr. vol. 1, 186. According to Mr. William Naquin, who was admitted as an expert in both physical therapy and CPT coding, there are two prerequisites for billing under the CPT codes. The first requirement is a threshold finding of medical necessity for the therapy or procedure. *Id.* at 187. Related to this requirement is the general understanding that any treatment billed for by the clinic is related to the injury reported to the clinic and diagnosed by its physician. *See* Tr. vol. 2, 33. The second requirement is administration either (i) by a licensed physician or therapist or (ii) "incident to" the practice of a licensed physician. Tr. vol. 1, 187-188; Ex. F, BSN 10028. Allstate attacks the therapy rendered in this case on both the necessity and supervision prongs.

*i. Treatment and Procedures Improperly Deemed Necessary*

To be billable, a treatment must be "deemed necessary" by a physician. Tr. vol. 1, 187.

Allstate argues that none of the treatments performed in these cases, nor any MRI requested, was

properly deemed necessary. *See, e.g.*, Rec. Doc. 453 at 13. This argument relies on various

objective findings that raise serious concern about the quality of diagnosis and care provided at

Community.[13] However, as indicated above, Allstate has not proven that Community's

physicians were not involved in diagnosing injuries, ordering treatments, or ordering MRIs. Thus

to establish a tort from the impropriety of those diagnoses and therapy recommendations,

Allstate would have to show that Community's physicians offered them either negligently or in

bad faith with respect to the CPT billing requirements, or, alternatively, that someone at

Community negligently or fraudulently misrepresented what the physicians actually diagnosed

and recommended. Physician malpractice is well beyond the scope of this litigation as defined by

the pleadings and the pretrial order. *Cf.* Rec. Doc. 383. There is no evidence to suggest that

persons associated with Community misrepresented diagnoses and therapy recommendations.

Therefore, any claim in this vein must fail.

*ii. Therapy not "Incident to" Physician Practice*

---

[13] Allstate presented evidence that: Community's injury diagnoses and MRI orders were not supported by proper clinical findings, needed to establish a relationship to the accident or a continuing need for treatment. Tr. vol. 2, 28, 33. It was generally improbable for any set of accident victims seen at a single clinic to have only this minimal degree injury. *Id.* at 26-36; Ex. LL, MM. Regardless of who ultimately devised each patient's therapy plan, the regimen was strikingly similar from patient to patient, despite differences in each patient's background and injuries. Passive modalities should be used to alleviate acute, objective symptoms, like spasms, inflammation, and swelling and discontinued within a few weeks - six at most - if those symptoms are not improving. Tr. vol. 1, 204-05; Tr. vol. 2, 45-46; Tr. vol. 3, 8. Some of the patients in this case were treated for months before their apparent discharge. There was no connection between the length of time a patient treated and his degree of injury, objectively speaking. Tr. vol. 2, 39-40. It is generally improper and substandard to treat a soft tissue injury with passive modalities alone. *Id.* at 32-33.

When modalities are not administered by licensed physical, occupational, or massage therapists or a physician himself or herself, they must be done "incident to" physician practice in order to be billable under CPT codes. Tr. vol. 1, 187-188, 191. For purposes of current procedural terminology, therapy is performed incident to physician practice when it is performed in the clinic while the physician is physically present. *Id.* at 188.

There was evidence that Community's treatments were not always administered in a physician's presence. *See, e.g.*, Tr. vol. 1, 159; Tr. vol. 4, 156; Tr. vol. 5, 58. Indeed, continuous physician presence does not appear to have been a goal for Community initially; after relocating to North Foster, it relied on physicians who maintained separate practices. Tr. vol. 1, 71, 149. Nevertheless, the Court does not find that this was an issue in Community's treatments after 2006 when Dr. Bell began seeing patients. Tr. vol. 5, 4. The technicians who testified that they administered therapies when doctors were not around each began working at Community before 2006. Tr. vol. 1, 171; Tr. vol. 4, 191; Tr. vol. 5, 41. The uncontradicted testimony of Kathy and Leon Hampton was that beginning then, the scheduled rotated between Drs. Williams, Jackson, and Bell. Tr. vol. 4, 195, 243. The 16 settlements for which fraud claims have not prescribed did not include any billing for treatments rendered before 2006.[14] Therefore, the Court need not analyze the merit of this accusation.[15]

---

[14] Ex. A, BSN 01610-21, 00563-77, 00997-01007, 01529-71, 01808-01844, 02589-2617, 02622-34, 02934-58, 03590-03605 04564-86, 04614, 04620-4684, 04696-04724, 04740-77, 04824-40, 04877, 04900-06, 05888-05933.

[15] Even if this issue were timely brought, the Court would have trouble believing Dr. Williams' testimony that Medicare thoroughly advised both he and Ms. Hampton as to the need for physician supervision sometime in 2000 or 2001 when Hampton effectively shut down. *See* Rec. Doc. 453 at 2; Tr. vol. 1, 104-06. Dr. Williams has been too eager to deny his involvement in Community, even in circumstances where there would have been no consequences to

*iii. Improperly Administered Therapy*

Allstate has claimed damages for the improper implementation of therapy recommendations, assuming they were made by physicians under the circumstances indicated in the records. *See* Rec. Doc. 443, ¶¶ B.16.h, B.123-126. The starting premise for this argument is that Community's physicians had no input in patient therapy. Rec. Doc. 453 at 16; *see also* Rec. Doc. 443, ¶¶ B.16.x, B.16.cc. Allstate has further identified a number of smaller issues reflected in treatment records that, according to Allstate, prove improper, unbillable administration of therapy and/or lack of physician supervision. These smaller issues include the application of modalities to patients before they were even seen or diagnosed by a doctor, Tr. vol. 1, 160, "[c]hanges in duration and composition of modality treatments without medical provider input" and administration "to areas of the body that were unrelated to the area of injury," Rec. Doc. 443, ¶¶ B.16.m, B.16.y, lack of a "valid," signed detailed prescription for therapy, *id.*, ¶ B.16.e; Rec. Doc. 453 at 17, the improper use of ultrasound to relieve pain, Rec. Doc. 443, ¶ B.120, and the improper performance of massage therapy by unlicensed technicians, ¶B.16.u.

At the outset, some of these smaller issues do not reflect representations inherent in the use of CPT coding that could even support a claim of fraud. *Cf.* Tr. vol. 1, 213 ("Under incident two [sic], a[n unlicensed] technician can do a massage, yes, sir."); *id.* at 190 (testifying that

---

admitting it. *Cf.* Ex. G, BSN 10065 (discrediting Dr. Williams's denial of signature). This suggests some desire to harm Ms. Hampton.

Ms. Hampton testified that she was not told about this issue in these conversations and did not gain meaningful knowledge of what Hampton and later Community were doing wrong until 2004 or 2005, when she was contacted by the FBI. Tr. vol. 2, 204-05, 232-33. She also testified that Medicare liaised with her about recording treatment times and offered to provide her different sheets to use. *Id.* at 149-150. All of this is consistent with her uncontradicted testimony that she managed Hampton Healthcare's treatment operations, while Michael Prince was in charged of billing. *Id.* at 142; Tr. vol. 4, 182.

therapy incident to physician practice does not require a therapy prescription). Without question, Community had no right to bill for treatments that lacked any shred of physician approval - for instance, those done for less time than the doctors thought was appropriate or those done to areas of the body that no physician authorized. However, the proof that this occurred is less persuasive than Allstate supposes. Although Dr. Jackson testified that she did not believe five minute modalities had medical benefit, Tr. vol. 1, 122, the records contained numerous instances where she either administered therapy to patients for 5 minute intervals or signed a record indicating her approval of the same. Ex. A, BSN 00569, 02599, 2617.

There was testimony that therapy administered "at the sole discretion of the untrained, unsupervised tech" would be unbillable. Tr. vol. 3, 10. However, the Court does not find that defendants were engaged in the provision of such unbillable therapies as a matter of business practice. Ms. Hampton started Community with Dr. Williams and Bridget Azaone, a technician who had previously worked in his office. Tr. vol. 2, 166; Tr. vol. 4, 191. Dr. Williams admitted that he supervised Community's care at the time. Tr. vol. 1, 70. It would be foolish to assume that Dr. Williams's imperatives were not reflected in treatments Bridget provided or in the training she gave to other technicians. Tr. vol. 4, 171. Dr. Jackson testified that she had some depth of knowledge in the area of medical billing. Tr. vol. 1, 123. Yet, when she came to Community full time in 2007, there is no evidence that she thought that billing was improper given lack of physician supervision or technician qualification. *See id.* at 139, 152. Even before then, Dr. Bell instructed the technicians on how to perform these modalities. Tr. vol. 4, 206.

All of this suggests two things: First, the level of non-physician discretion intentionally built into Community's treatment model was not *per se* improper. In this regard, the Court notes

that even when Dr. Jackson was working three days a week at Community, she relied on general prescriptions for therapy that allowed for some non-physician[16] input into which modalities were received for what time period on a particular day. *See, e.g.*, Ex. A, BSN 01525, 01529-71. Second, Community's problems with implementing therapy were temporary and coincided with physician supervision problems at the North Foster location. It follows that defendants had corrected matters by 2006. Having examined the treatment records for the 16 unprescribed settlements, the application of modalities is faithful to the physician's determination of the areas affected by injury. Dr. Jackson either administered some of these therapies or for some other reason, signed the modality treatment forms. The Court cannot find that defendants breached a standard of care or intended to defraud by attempting to bill for such services.

*iv. "Action Plan"*

Allstate claims that the propriety of Community's treatments was fatally undermined by the fact that Leon Hampton designed and implemented the clinic's standard "action plan," whereby each patient treated for a minimum of three months, regardless of whether such treatment was necessary. *See* Rec. Doc. 453 at 6; Ex. I. This argument is based on Dr. Williams's characterization of the action plan. Tr. vol. 1, 58, 89-90. Leon Hampton testified, and the action plan itself indicates, that the schedule indicated thereon is only intended to advise patients of what treatment might entail. *Id.* at 68. In other words, it was not used to supplant physician judgment about the necessity of continued treatment.

For a variety of reasons, the Court does not credit Dr. Williams's accusation. As stated,

---

[16]Allstate has assumed, without proving, throughout this litigation that Community's technicians were basing the length of therapy on their own uneducated opinion, as opposed to input from each patient.

his testimony regarding prescriptions and MRIs has not been trustworthy. Second, although the action plan indicates that discharge happens after three months of therapy, it states plainly that discharge is at the discretion of the treating physician. Ex. I. Third, if Leon Hampton had actually tried to insist that all of Community's patients treat under a generic therapy plan, it stands to reason that it would have offended more than just Dr. Williams, who, by all accounts, was Community's least ethical physician. Dr. Jackson overlapped with Dr. Williams for several years at Community. Although she appears to have been less involved early on, it is undisputed that Dr. Jackson worked full time in the clinic from March 2007 to November 2007. Tr. vol. 1, 139. It is telling, Dr. Jackson did not remember this treatment plan issue being something unethical that defendants asked her to do. *See id.* at 152. Accordingly, this claim has no merit.

## e. Forged and Photocopied Modality Forms

To develop an itemized bill, someone at Community was supposed to examine the treatment notes in each patient file. Tr. vol. 3, 83. These treatment notes were dated with a circle around the time that each modality - electrical stimulation, massage, ultrasound, etc. - was applied to the patient.  The notes further contain a space for the patient and the technician to sign, indicating that the treatments circled were performed on the date and for the times indicated.

A review of 34 files in this case, conducted by Allstate's forensic document examiner, Robert Foley, revealed that 20 contained modality forms with technician signatures that had been photocopied or forged. Ex. G. Technicians, Bridgette Azaone and Jessica Woolridge testified that they did not photocopy their names on modality forms. Tr. vol. 3, 163-64; Tr. vol. 4, 62. Although Kenneth Jackson did not testify in this case, Mr. Foley compared a known exemplar of

his signature with that present on a number of modality treatment forms and found a significant probability that Mr. Jackson's signature was forged. Tr. vol. 2, 105.

Allstate claims that it was defrauded with respect to modality forms submitted with forged or photocopied signatures and/or technician notes. Defendants argue that this does not constitute fraud because Allstate has not proven that the therapy evidenced by the forged or photocopied note did not happen. However, this argument misses the thrust of Allstate's fraud claim. What Community concealed through its use of forged and photocopied treatment notes was the fact that it lacked contemporaneous treatment records. There was evidence that these were the kinds of document discrepancies that triggered bill adjustment and reduction. Tr. vol. 4, 56, 66.

These were intentional misrepresentations.[17] Nevertheless, Allstate has failed to identify a forged or photocopied modality treatment note among those 16 claims paid recently enough to avoid prescription.  *See* Exs. C & N; Rec. Docs. 443-1, 443-2, 443-4.

*f. Upcoding and Billing at Improper Intervals*

Community's standard treatment notes allowed technicians to record the application of a modality to a patient in 5 minute increments for up to 15 minutes. No matter how long the

---

[17]Regarding responsibility for these acts, forgeries and photocopies most likely occurred during collection attempts. It follows that the person who either responded to a subpoena for records billing is the most likely culprit for any doctored records. Reviewing the files where these irregularities were noted, it does not appear that any were certified by Kathy Hampton or Leon Hampton. Almost all, if not all, of the records that have been certified in response to a subpoena, were certified by Della McGuire. *See, e.g.*, Ex. A, BSN 00001, 00158, 02501, 03052, 03108. There has been no evidence that Ms. Hampton directed Ms. McGuire to act in this manner. Ms. Hampton's uncontradicted testimony was that she had no idea that technician notes had been forged or photocopied. Tr. vol. 4, 200. In light of the foregoing, the Court can only hold Community liable as a business for these apparent acts of fraud, subject to proof of injury and prescription.

technician recorded the modality as being performed, Community billed using the same CPT code for each visit, which reflected a 15 minute increment of treatment. Tr. vol. 2, 22. There is a modifier code that allows the provider to bill in increments fewer than 15 minutes that Community did not use in its billing. *Id.* at 23.

Further, Community used billing code 97032 for its electrical stimulation to patients. This code only applies to "attended" electrical stimulation which requires manual application of a point probe. Tr. vol. 1, 217. Community used a TENS machine, which, according to Allstate's expert, Billy Naquin, is always billed as "unattended" under code 97014 unless the patient is being instructed in the use of the TENS machine. *Id.* Even in the instruction scenario, the attended code can be used only once. *Id.* A smaller fee is associated with electrical stimulation under code 97014. *Id.* at 126.

The 16 files for which fraud claims have not prescribed contain improperly-billed, five minute treatments. Because Ms. Hampton testified that Dr. Williams supplied her with the CPT codes she used in the practice, the Court does not conclude that she intended to deceive or was aware of the difference between the two codes. Tr. Vol. 2, 231. Assuming it was negligent for Ms. Hampton to allow this mistake to persist, the evidence does not allow the Court to calculate the value of this negligence, apart from analyzing Allstate's claim that it would not have paid settlements. Allstate's witnesses did not state the difference in price for attended versus unattended electrical stimulation or five and 15 minute modalities. *See* Tr. vol. 1, 196-98; Tr. vol. 2, 22; Ex. F. The Court will therefore analyze Allstate's argument that it would not have paid any money to settle claims wherein these issues were present.

*g. "Certified Health Care Facility"*

Community's lien agreements and lien notices, both of which Community routinely furnished to Allstate, indicate that Community has a statutory entitlement to liens against accident claimants under La. Rev. Stat. 9:4751, as a "certified health care facility." Dr. Herring testified that this representation misrepresented the truth because Community, as a business entity, was not "licensed by this state to provide health care or professional services." Tr. vol. 2, 8-9; *accord* La. Rev. Stat. Ann. § 9:4751. The Court does not find that Ms. Hampton intended to deceive with respect to this misrepresentation, in that she may have believed in good faith that retaining a services of a certified health care provider entitles one to bill as a certified health care facility. This issue has alluded some many more sophisticated than Ms. Hampton. *Cf. Remet v. Martin*, 97-0895 (La. App. 4 Cir. 12/10/97), 705 So. 2d 1132, 1134 (clarifying that employees of certified health care providers are not certified health care providers). Assuming that Ms. Hampton can be liable for negligent misrepresentation, the Court will consider the extent to which this misrepresentation impacted settlement below.

*h. "Physical Medicine" & "Rehabilitation"*

Community claimed to provide physical therapy, physiatry, physical medicine, and rehabilitation in many of the documents that it provided to patients and Allstate. Community's action plan indicated that each patient would be receiving "physical medicine" and included a definition of that term. Ex. I. Community's modality treatment forms sometimes represented that its technicians were Physical Therapy Specialists. Ex. A, BSN 00583. Some Community's billing and modality treatment forms indicate a capacity to provide active modalities. *See, e.g.*, *id.* at 02465, 02496, 02551. In 2007, Community changed its name to Community Health and Rehabilitation Center, thereby furthering the perception that it was capable of providing

rehabilitative therapies.

The Court will consider the extent to which these misrepresentations harmed Allstate, due to their presentation to Allstate directly. Insofar as Allstate means to claim damages from the reliance of third parties (attorneys and accident victims) on Community's misrepresentations, the evidence only points to possible, rather than actual, reliance on the part of those third parties. Patients came to Community on referral. Tr. vol. 2, 45. None of the referring attorneys or treating patients testified that they used Community because of the false impression that clinic gave regarding its treatment capacity.

*i. Misrepresentation by Silence or Omission*

Allstate argues that defendants breached a duty to disclose the "nature and extent" of their fraudulent practices and scheme. Rec. Doc. 443, ¶¶ A.4-A.5. To establish a claim for misrepresentation based on silence or omission, a plaintiff must show that the defendant owed a duty to speak under the circumstances. *Kadlec Med. Ctr. v. Lakeview Anesthesia Associates*, 527 F.3d 412, 418 (5th Cir. 2008) (quoting *Greene v. Gulf Coast Bank*, 593 So. 2d 630 (La. 1992)). In Louisiana, although one may be liable in tort if he or she intentionally or fraudulently made misstatements, "[t]here is no general duty to speak . . . ." *Clark v. Constellation Brands, Inc.*, 348 F. App'x 19, 21-22 (5th Cir. 2009) (citing Frank L. Maraist & Thomas C. Galligan, Jr., Louisiana Tort Law§ 5-7(h) (1996)); *see also Daye v. Gen. Motors Corp.*, 97-1653 (La. 9/9/98), 720 So. 2d 654, 666 (same). Further, no duty to speak arises automatically from a previous misrepresentation, even if there was a duty to avoid the misrepresentation in the first place. *See Nat'l Council on Comp. Ins. v. Quixx Temp. Servs., Inc.*, 95-0725 (La. App. 4 Cir. 11/16/95), 665 So. 2d 120, 123.

Whether one party owes another a duty to speak depends on the nature of the relationship between the parties and the nature of the information allegedly suppressed. *See Greene*, 593 So. 2d at 632; *Bunge Corp. v. GATX Corp.*, 557 So. 2d 1376, 1383-84 (La. 1990). Such a duty has been found where a fiduciary relationship exists. *Greene*, 593 So. 2d at 632; *Bunge Corp.*, 557 So. 2d at 1383-84. A separate line of cases holds that manufacturers and vendors have a duty to warn regarding hazards inherent in the ordinary use of property, notwithstanding lack of a fiduciary relationship. *Id.* at 1383-85. Neither of these doctrines justifies the imposition of a duty to disclose on defendants.[18]

"[W]hether a fiduciary duty exists, and the extent of that duty, depends upon the facts and circumstances of the case and the relationship of the parties." *Scheffler v. Adams & Reese, LLP*, 06-1774 (La. 2/22/07), 950 So. 2d 641, 647. A fiduciary relationship exists "when confidence is reposed on one side and there is resulting superiority and influence on the other." *Id.* (citations omitted). "The defining characteristic. . . is the special relationship of confidence or trust imposed by one in another who undertakes to act primarily for the benefit of the principal in a particular endeavor." *Id.* at 648. The party claiming for breach of a fiduciary duty must show "a legal relationship that would give rise to [the duty]," for example, the existence of a contract or a mandate, either express or implied by law. *Id.*

Allstate offers no basis to conclude that defendants were acting as its fiduciaries with

---

[18]Because there is no final decision by the Louisiana Supreme Court on this question, consideration of Allstate's argument requires the Court to make an "*Erie* guess" at how that court would resolve this question. *See In Re Katrina Canal Breaches Litigation*, 495 F.3d 191, 206 (5th Cir. 2007). The Court's goal in this exercise is to predict how the Louisiana Supreme Court would rule rather than create or modify state law. *Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 628 (5th Cir. 2000).

respect to these transactions. There is no contract whereby Community agreed to act on Allstate's behalf or for its benefit in evaluating and treating persons injured by its insured. The status quo does not justify assigning a heightened duty to defendants. Community's primary role in these transactions is that of a self-interested actor. Fraud or no fraud, corporate healthcare providers have a legitimate interest in attempting to obtain maximum return for helping the injured obtain maximum medical recovery. The insurance company has a financial interest in resolving any liability claim for the least amount possible. This arrangement naturally leads to disagreement regarding the necessity and market value of treatments.

Allstate further fails to establish, as a practical matter, that its position vis-a-vis defendants necessitated reposing great confidence in them. Allstate has some institutional experience and sophistication in the analysis of medical claims and billing, as well as ample ability to investigate patient injury and the circumstances of care purported to be necessary. *Cf. Greene*, 593 So. 2d at 632 (analyzing experience and sophistication); *Am. Guar. Co. v. Sunset Realty & Planting Co.*, 208 La. 772, 796, 23 So. 2d 409, 417 (1944) ("We are not presented with a case of an advantage being taken of an inexperienced person."). They have devoted an entire unit to fraud investigation. For any given accident, there are police reports and witness statements to consider. Rec. Doc. 431 at 41. Allstate has computerized tools to help value claims and identify fraud. Tr. vol. 4, 21, 56, 126-27. It employs field analysts that can inspect treatment sites. Tr. vol. 4, 119; Ex. GG, BSN 11125. It can and does withhold settlement pending the resolution of significant questions. Tr. vol. 4, 111, 142. That it may not always be in Allstate's financial interest to investigate a claim does not justify finding a heightened duty on defendants' part.

Similarly, the vendor/manufacturer duty to warn has no bearing on this case. This duty is more likely to arise when a condition or defect in property poses a risk to personal health or safety, as opposed to mere market value, and it is "not within reach of diligent attention, observation and judgment." *Bunge Corp.*, 557 So. 2d at 1384. As discussed, Allstate has the power to investigate the value of the services provided. While generally the provision of false medical records is a very serious matter with health and safety implications, Allstate has not established how the provision of such records to it specifically posed a threat to anyone's health or safety. It would be a different case entirely, if it appeared that these records ultimately made their way to other physicians or healthcare providers. For these reasons, the Court does not find that defendants breached any affirmative duty to supply information regarding the "nature and extent" of their fraudulent practices and scheme.

### 4. Causation of Injury

For those 16 cases that have not prescribed, the foregoing analysis shows that defendants miscoded their treatments and provided initial evaluations which falsely purported to be the statements of a treating physician and only loosely captured the diagnostic examinations performed. Allstate would argue that its adjustors and ECs would not have authorized any of these 16 settlements had matters been properly represented. Rec. Doc. 435 at 26-27.

To prove this claim, Allstate must show their reliance on these matters was a substantial factor in their detrimental decision to settle. *Cf. Allstate Ins. Co. v. Receivable Fin. Co., L.L.C.*, 501 F.3d 398, 407-08 (5th Cir. 2007). Allstate points to the testimony of several adjustors and evaluation consultants, who testified that he or she probably would not have recommended any settlement had they known that Community's records and billing were "fraudulent." *See id.* at

17, 46 (Michael Fontenot); *id.* at 52-53, 83 (Glen Holyfield); *id.* at 88, 91 (Susan Norene); *id.* at 108 (Michael Broussard).

The testimony of these witnesses ultimately fails to persuade the Court because it relies on what have proven to be false assumptions about the extent and severity of fraud in any given Community case. Allstate's attorney only asked each witness how he or she would react to knowledge that Community's documents were "fraudulent" generally speaking. By "fraudulent," counsel was apparently referring to every allegation of fraud made in this case. *See id.* at 83-84 (asking about fraud "as we have argued in this case"); *see also id.* at 46 (asking about fraud in terms of any "unreliable misrepresentations of what occurred."). This was obviously a loaded question, the answer to which does little to help Allstate meet its burden after the Court has whittled away so substantially at the central allegations of its complaint.

The patients at issue in these 16 unprescribed claims were seen by physicians and given recommendations for therapeutic modalities which were subsequently administered by appropriately supervised technicians. The Court has not found that any patient was evaluated by a technician and then rushed into a generic treatment regimen that was also administered at the sole discretion of a technician. The Court has not found that Community furnished fake prescriptions or MRI orders to exaggerate the extent of patient injury. The Court has not found that treatment was unnecessary in all of these cases because none of the patients were even injured. What Allstate's employers actually would have known had defendants avoided the misrepresentations established by evidence is that Community's physicians did not perform neurological or transferring tests during initial evaluations, that patients had not done a "transferring test" before the doctor rendered his diagnosis, and that no licensed physical

therapist was secretly waiting in the wings while Community's unlicensed technicians administered therapies. The Court cannot assume that each witness had this "toned down" version in mind when he or she answered counsel's question. Thus, the Court cannot rely on the testimony offered to conclude that Allstate's employees would have rejected settlement in any of these cases.[19]

There is little evidence that the adjustors and ECs were moved by the misrepresentations actually advanced in the records and billing underlying Allstate's 16 unprescribed settlements. Their proffered reasons for consulting medical records and billing were to verify of injury and assess of potential liability for medical bills, all based on diagnosis, length of treatment, and

---

[19]The testimony offered is also difficult to square with the practical realities of claims processing. *Cf. Allstate Ins. Co.*, 501 F.3d at 414 n.16 ("[S]everal factors other than reliance on the truth of an opponent's allegations may influence a party's ultimate decision to settle disputed claims in a lawsuit . . . ."). Based on the evidence presented, the factors that might prevent an adjustor from exercising his or her good judgment about the merits of a claim are several and include (1) the jurisdiction from which the claim originates, (2) outside verification of a substantial injury, and (3) a very low policy limit by the insured. *Id.* at 28, 66-68, 147. The evidence shows that where these factors are present, they can overwhelm the decision to place an offer on a case. Ex. HH, BSN 11134. Allstate's evidence does not address whether and to what extent these "complicating factors" were present in the cases at issue here.

Finally, even if the Court were to credit this testimony, Allstate's evidentiary presentation fails to address the financial implications of the no-settlement scenario based on the complicating factors identified above. It stands to reason that there would be some implications because the Company concluded that its insured was both liable for the patient's injuries and covered under an Allstate policy in all of these cases. *See, e.g.*, Tr. vol. 4, at 123. Although Dr. Herring found reason to doubt that Community's patients had in fact sustained injury in their accidents with the insured, it still appears that the patients believed in their own pain and injuries. Most of them retained counsel before ever coming to Community. Under these circumstances, it is unlikely that Community's patients would simply abandon their claims against Allstate's insured, even if settlement had been rejected in light of unmeritorious medical billing. Even assuming each patient lacked any viable claim for medical expenses, this does not foreclose liability for general pain and suffering as an item of damages. There is a cost associated with resolving even a nuisance lawsuit. All of this both undermines the testimony offered and points to the incompleteness of Allstate's damages claim.

services ordered or prescribed. *See* Tr. vol. 4, 6-7, 21, 122. Status as a "certified health care provider" is not required for billing purposes. The adjustors and ECs only indicated that they relied on Community's liens to include its name on checks issued in settlement. Tr. vol. 4, 18, 51, 81. While Community misrepresented its technician's physical therapy qualifications in some files in this case, this appears to have only happened when they were providing billable therapy under the "incident to" model. *See, e.g.*, Ex. A, BSN 00583. An SIU analyst had already concluded that Community was using "boiler plate" narratives, among other forms of misrepresentation, and decided that such matters were not worth denying settlement. Ex. GG, BSN 11125. For these reasons, Allstate has not met its burden to show reliance on matters misrepresented to its detriment and these claims must fail.

## B. Claim 2: Unjust Enrichment

Allstate argues that it is entitled to remedies for unjust enrichment pursuant to La. Civ. Code art. 2298. Rec. Doc. 443, ¶ 16. The elements of such a claim are: "(1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and the impoverishment, (4) an absence of justification or cause for the enrichment and impoverishment, and (5) no other available remedy at law." *Westbrook v. Pike Elec., L.L.C.*, 799 F. Supp. 2d 665, 672 (E.D. La. 2011) (quoting *Baker v. Maclay Props. Co.*, 648 So. 2d 888, 897 (La. 1995)). Such a remedy is "subsidiary in nature, and 'shall not be available if the law provides another remedy.'" *Walters v. MedSouth Record Mgmt., LLC*, 10-0351 p. 2 (La. 6/4/10), 38 So. 3d 245, 246 (citing *Carriere v. Bank of Louisiana*, 95-3058, p. 17 (La. 12/13/96), 702 So. 2d 648, 671 (on rehearing)). This is true even where a previously available cause of action has prescribed. *Walters*, 10-0351, 38 So. 3d at 246 (citing *Jim Walter Homes v. Jessen*, 98-1685, p. 13 (La. App. 3 Cir. 3/31/99), 732 So.

2d 699, 706). The burden of proof in a claim of unjust enrichment lies with the party seeking relief. *See First Nat. Bank of Commerce v. Ordoyne*, 528 So. 2d 1068, 1071 (La. Ct. App. 1988).

Depending on the circumstances, Allstate fails to meet its burden to show lack of cause for impoverishment or lack of remedy at law. The reason for Allstate's losses in this case was its payments to Community patients in order to settle their rights in litigation. Obviously, where defendants' records and billing were false in some way relied upon in those settlements, Allstate had a remedy at law for fraud or negligent misrepresentation that defeats recovery for unjust enrichment. Further, where no falsehood was relied upon, Allstate cannot prove failure of cause for the compromise it entered into with Community's patient. For purposes of state law, failure of cause is a more onerous burden than mere materiality. La. Civ. Code art. 1955. For these reasons, this claim lacks merit.

## C. Counterclaim 1: Defamation

Defendants claim that Allstate has defamed them with unfounded accusations of fraud. Defamation is a tort involving the invasion of a person's interest in her reputation and good name. *Kennedy v. Sheriff of E. Baton Rouge*, 05-1418 (La. 7/10/06), 935 So. 2d 669, 674 (citing *Costello v. Hardy*, 03-1146 (La. 1/21/04), 864 So.2d 129, 139). To establish a claim for defamation, defendants must show: (1) a false or defamatory statement (2) unprivileged publication to a third party (3) fault on the part of the publisher and (3) injury. *Id.*

As an initial matter, Allstate asks the court to resolve this claim based on its assertion qualified privilege. Rec. Doc. 453 at 28. Allegations made in the context of a judicial proceeding are subject to qualified privilege. *Kihneman v. Humble Oil & Ref. Co.*, 312 F. Supp. 34, 40-41 (E.D. La. 1970). To break that privilege, a defamation plaintiff must show that the

allegations in question were immaterial to the judicial proceeding in which they were made, made without probable cause, or made with actual malice as opposed to any other blameworthy state of mind. *Costello*, 03-1146, 864 So. 2d at 142 n.13. However, Allstate failed to raise qualified privilege as a defense its answer to the defendants' counterclaim, as required by Fed. R. Civ. P. 8. Rec. Doc. 332. Therefore, Allstate is barred from asserting it now. *See Combee v. Shell Oil Co.*, 615 F.2d 698, 700 (5th Cir. 1980).

More importantly, the Hamptons have not claimed for Allstate's allegations of fraud in this proceeding; rather, according to their post-trial memorandum, they claim only for statements that Allstate's adjustors and investigators made directly to its patients regarding the legality of their business practices. Rec. Doc. 455 at 30. While such statements, if proven, might qualify as *per se* defamatory, thereby obviating the need for proof on the remaining elements, *Kennedy* 05-1418, 935 So. 2d at 675, the Hamptons have introduced no competent proof that Allstate's employees actually made such statements. Therefore, the Hamptons' defamation claim must fail.


**E. Counterclaim 2: Tortious Interference**

Defendants next claim that Allstate tortiously interfered with their business by calling and harassing its referring attorneys and patients. Louisiana law recognizes a cause of action for tortious interference with business relations that derives from La. Civ. Code art. 2315. *Bogues v. Louisiana Energy Consultants, Inc.*, 46,434 (La. App. 2 Cir. 8/10/11), 71 So. 3d 1128, 1134 (citing *Junior Money Bags, Ltd. v. Segal*, 970 F.2d 1 (5th Cir.1992) and *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594 (5th Cir.1981)). The action protects the businessman from malicious and wanton interference while protecting the legitimate interests of the actor. *Id.* A plaintiff in

such an action has the burden to show that the defendant improperly influenced others not to do business with him. This burden is not satisfied by general allegations of a decrease in business. One party must show that the other actually prevented him from having dealings with an identifiable third party. *Id.*

In addition, Louisiana courts have restricted the availability of this action through the requirement of malicious intent. *Id.*; *Dussouy*, 660 F.2d at 602. Such a showing is considered "difficult (if not impossible) to prove in most commercial cases in which conduct is driven by the profit motive, not by bad feelings." *Bogues,* 71 So. 3d at 1135 (quoting *JCD Mktg. Co. v. Bass Hotels and Resorts, Inc.*, 01-1096 (La.App. 4th Cir. 3/6/02), 812 So. 2d 834, 841).

The evidence does not show that Allstate's conduct actually prevented defendants from obtaining any attorney referrals in this matter. Although Ms. Hampton testified that she had been receiving fewer referrals since this lawsuit began, she provided no admissible evidence to establish Allstate's role in this decrease. *See* Tr. vol. 4, 216 (hearsay objection sustained). Moreover, even assuming Allstate was responsible, the Hamptons have not shown that Allstate was acting out of malice, rather than a legitimate motive to prevent billing for unnecessary treatment. For these reasons, this counterclaim fails.

## V. CONCLUSION & ORDER

 Plaintiffs' claims of fraud and/or negligent misrepresentation either have no merit or they have prescribed to the extent that they had any merit in the first place. Plaintiffs' claim for unjust enrichment has no legal merit. Defendants' counterclaims of defamation and tortious interference with business against Allstate are unsupported by the record.

Accordingly,

IT IS ORDERED that judgment be entered in favor of defendants and against plaintiffs on plaintiffs' claims for fraud, misrepresentation, and unjust enrichment.

IT IS FURTHER ORDERED that judgment be entered in favor of plaintiffs and against defendants on defendants' counterclaims.

New Orleans, Louisiana, this 28th day of April, 2014

**HELEN G. BERRIGAN**
**UNITED STATES DISTRICT JUDGE**